Filed 3/21/14  P. v Moore CA3

<u>**NOT TO BE PUBLISHED**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C071767 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 08F08496, 10F06388) |
| v. | ORDER MODIFYING OPINION |
| JESSIE TREVON MOORE, | [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the nonpublished opinion filed herein on March 10, 2014, be modified as follows.

At page 15, amend the last sentence at the end of part V. of the Discussion (just prior to the Disposition), which reads:  "We will modify the judgment to reduce the two fines to $200." to add the following inadvertently omitted footnote 8 so that it now reads:

1

We will modify the judgment to reduce the two fines to $200.**8**

_____

**8** In any event, as the concurring opinion properly notes, there could not be a conceivable tactical basis (other than inadvertence) for defense counsel to fail to object to the imposition of a restitution (and parole revocation) fine greater than the minimum in effect at the time of sentencing when the trial court had clearly indicated its intention to impose the absolute minimum fines. While it is true defendant has not asserted on appeal the ground of ineffective assistance of counsel, the People have had the opportunity to address the issue indirectly: They note trial counsel might reasonably have feared incurring an objection from the prosecutor. (The assertion is unavailing; if the prosecutor was inclined to object to a minimum set below the guideline in the statute for a sentence as lengthy as defendant's, he would have done so in response to the court's setting the fines at $240.) Given that we are not precluded from reaching an issue of law in the first instance on appeal in the exercise of our discretion (other than the admission or exclusion of evidence (*People v. Williams*, *supra*, 17 Cal.4th at p. 161, fn. 6; see *People v. Rosas* (2010) 191 Cal.App.4th 107, 115), and the People are not caught unawares as a result, we would need to reduce the fine to the correct minimum on this alternative basis.

There is no change in judgment.

BY THE COURT:


_____ROBIE_____, Acting P. J.


_____BUTZ_____, J.


_____MAURO_____, J.


Copies to: All parties


2

**NOT TO BE PUBLISHED**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C071767 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 08F08496, 10F06388) |
| v. | |
| JESSIE TREVON MOORE, | |
| Defendant and Appellant. | |

A jury found defendant Jessie Trevon Moore guilty of attempted voluntary manslaughter (as a lesser offense of attempted premeditated murder, a gesture of surprising leniency), firing a gun at an occupied car, and being a convicted felon in possession of a gun.  It also sustained enhancements that alleged personal infliction of great bodily injury in circumstances of domestic violence and various types of gun use.

The trial court found defendant to be in violation of probation in a 2008 case based on the evidence at trial and revoked the order of probation.  The trial court sentenced defendant to state prison for an indeterminate life term, with a concurrent prison term for the 2008 drug offense.

1

Although included in his notice of appeal, defendant does not raise any issues regarding the revocation of his probation in the 2008 case. We accordingly deem the appeal of case No. 08F08496 to be abandoned and shall dismiss it. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

Regarding his current offenses, defendant contends the trial court erred when it allowed the prosecutor to impeach his testimony with his failure (on advice of counsel) to bring exculpatory facts earlier to the attention of the police; did not instruct sua sponte on lesser offenses in connection with the charge of shooting at an occupied car; improperly instructed the jury with respect to the gun use enhancements; did not adequately reply to a question from the jury; and imposed the wrong minimum amount for the restitution and parole revocation fines. (We have reordered defendant's arguments to reflect the chronology in which they arose in the trial court.) We shall affirm the judgment in case No. 10F06388 as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

We resolve all explicit evidentiary conflicts in favor of the judgment and presume in its favor all reasonable inferences. (*People v. Mack* (1992) 11 Cal.App.4th 1466, 1468.) "We include this reminder because defendant's rendering of the facts highlights what he deems to be inconsistencies and credibility issues with respect to the . . . witnesses. . . . [However], the jury resolved these credibility issues against defendant and we are bound by that resolution. Accordingly, we set forth the evidence without defendant's extensive [emphasis of facts] regarding its reliability." (*People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3.)

Defendant and his girlfriend, T.W., began dating in June 2010, and he had physically abused her on other occasions (the circumstances of which we do not need to detail). Although T.W. initially denied being a victim of domestic violence when she was questioned in May 2011, she reported these incidents to the prosecution in April

2

2012. Defendant and T.W. jointly shoplifted merchandise, returning it to the stores for gift card credit and then selling the gift cards for cash. A couple of days before the shooting, T.W. had just gotten $150 for selling gift cards.

On the morning of the shooting, August 12, 2010, defendant and T.W. quarreled in the garage of his mother's house (where he was living), which became physical after T.W. told him she wanted to end their relationship and he told her to give him all the money she had with her, grabbing for her purse. T.W. broke away from defendant and went into the house. Defendant drove off to the store. After he left, T.W. called a friend for a ride. When T.W. went outside to get in the friend's car, she encountered defendant and another fight ensued when he tried to prevent her from leaving. The friend drove off. The fight continued until defendant's mother intervened and agreed to drive T.W. to her friend's home.

T.W. sat in the locked car while waiting for defendant's mother to retrieve something she had left inside. Defendant shouted that he was going to shoot T.W. in the head and kill her. Defendant followed them to a gas station with his brother and cousin. When defendant's mother went into the store to pay for gas, defendant again came up to the car and threatened to shoot and kill T.W. When defendant's mother returned, defendant told her that T.W. owed him money. Defendant's brother got into the car with the mother and T.W., and they drove to the home of T.W.'s friend without further incident. Defendant phoned T.W. later in order to inform her that his brother had told him where she was staying.

T.W. decided to go shopping with her friend, her friend's sister, and her friend's mother. When the group went to get into the friend's car, they[1] saw defendant's car

_____

[1] The friend did not testify.

3

across the street; T.W. and the sister saw defendant sitting in the driver's seat with other people in the car, one of whom T.W. recognized as defendant's cousin.

As the friend drove off in her car, defendant drove his car at an angle toward the passenger side, where T.W. was sitting. The friend stopped the car down the block because she was afraid defendant was going to run into them. T.W. and the sisters' mother testified that defendant shouted for T.W. to get out of the car and give him his money. T.W. and the sisters' mother saw defendant aiming a gun at T.W. The sisters' mother testified that the gun "started shooting."[2] T.W. turned away and *heard* several shots, the first of which struck her in the shoulder. The sister did not see who was shooting, and dropped to the floor after the first shot. The bullet fractured T.W.'s shoulder blade and C7 vertebra, and bruised her lung.

As the friend tried to flee down the street in her car, her sister and mother could hear more shots being fired from behind them. The rear window of their car shattered, and the friend stopped the car. When she started to move the car again, defendant's car drove past them one more time and the shooting resumed. Defendant's car then drove off.

Seven months later, in March 2011, defendant was arrested in Redding; according to the probation report, police saw him leaving the area of a possible car burglary and he resisted the officers, at which point they found a gun in his backpack. He entered a plea inter alia to being a convicted felon in possession of a gun, and was sentenced to state prison. Forensic testing could not connect this gun with the one used in the shooting. This gun had a "King Cobra" emblem on it; T.W. had seen a gun in defendant's possession three or four times, which resembled the gun he used in the shooting, but she did not remember it having this emblem.

---

[2] In her initial statement to the police, the sisters' mother said she *saw* defendant fire the gun. However, at the preliminary hearing, she said she saw the gun in the driver's hand and then ducked without seeing who actually fired the shots.

Defendant testified. He had given money to T.W. to get an apartment, and wanted it back but she refused. He had been driving the car, but it was his cousin (who was sitting behind him in the back seat) who fired the shots from the car out of pique because T.W. had sold the cousin a gift card that did not have any balance on it and would not return his money. Defendant had his own gun in the car, but *never* aimed or fired it. He had not been aware his cousin had also been carrying a gun. Defendant drove to the home of his great-grandaunt[3] and dropped off his cousin. He never saw the cousin in person again. Later that day, defendant got a ride to Redding, where he remained (except for visits to Sacramento) until his arrest and conviction for the unlawful possession of the gun. (We will incorporate additional facts relating to his testimony in the Discussion).

## DISCUSSION

### I. The Impeachment Testimony Was Proper

Toward the end of his cross-examination, the prosecutor began to ask defendant why he had not called the police after dropping off his cousin at the great-grandaunt's home immediately after the shooting. Defendant asserted that he was sure someone would report the cousin to the police and did not think it was his place to do so; he did not want to get involved. Defense counsel lodged an ongoing "right to silence" objection, which the trial court overruled. Defendant admitted that he became aware of an October 2010 warrant for his arrest for the shooting when he visited Sacramento in November 2010, but still did not want to get involved and simply hoped the police would catch the right person. He had tried to persuade his cousin over the phone to turn himself in. The prosecutor asked defendant why, if he had returned to Sacramento to "clear his

---

[3] The cousin's grandmother, making him defendant's second cousin once removed (to be exact).

5

name,"[4] he had never volunteered any information about his cousin's involvement to Sacramento jail officials while he was awaiting trial in this matter or contact his family to urge the cousin to surrender. Defendant said he had provided this information to defense counsel (at which point the trial court directed him not to testify any further about any conversations with defense counsel about this case). Defendant also stated that he had asserted his innocence generally to jail personnel, but no one ever questioned him about the basis for this claim.

In subsequent argument regarding the continuing objection, defense counsel stated that he indeed had told defendant not to speak to anyone regarding his case before trial. Defense counsel thus also objected to the entire line of questioning because defendant could not answer without waiving the attorney-client privilege. The trial court indicated it might agree with this line of argument regarding the point in time after defendant was in custody in Sacramento, but it did not apply beforehand. The court ruled that the earlier period was relevant to the issues of flight and consciousness of guilt, the privilege against self-incrimination was not involved because defendant had not invoked it in the course of any questioning after he was in custody (either in Redding or in Sacramento), and the issue of breaching the attorney-client privilege was not a problem any longer because the jury was now aware defendant had been acting under the advice of counsel[5] without the need for any further exploration of defense work product. The court also denied a request for mistrial or admonishment.

---

[4] This was a reference to defendant's demand in March 2011 to be tried on the present charges (Pen. Code, § 1381; undesignated statutory references will be to this code) after his Redding conviction; he was transferred to the Sacramento County jail in May 2011.

[5] This point actually was conveyed only inferentially. Although the trial court had asked defendant a question to this effect in the course of reining in defendant's testimony on the subject of his conversations with defense counsel, defendant never directly responded; he only reasserted that he had told defense counsel about the cousin and this did not result in anyone asking him about the cousin.

6

On appeal, defendant asserts that we should analogize to the principle of *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] (*Doyle*)—which precludes any adverse use of a defendant's invocation of his privilege against self-incrimination after receiving the advisements prescribed in *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] before custodial interrogation—and also preclude adverse use of a defendant's failure to provide exculpatory evidence of his innocence to authorities before trial on advice of counsel.  He concedes the record lacks any evidence that he was ever advised of the privilege against self-incrimination in the course of any custodial interrogation, and thus *Doyle* does not apply directly.  (*Fletcher v. Weir* (1982) 455 U.S. 603, 605-606 [71 L.Ed.2d 490, 493-494] (*Fletcher*) [noting also that *Doyle* does not apply to *pre*-arrest silence].)  He thus argues that because the prosecutor's questions about his failure to tell anyone about the cousin's involvement included the period after defense counsel's appointment in this matter, this was a violation of due process that defendant declares ipse dixit to be prejudicial.

In the first place, defendant has forfeited this argument (*People v. Homick* (2012) 55 Cal.4th 816, 861; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106), as he has failed to elaborate *how* the purported error could possibly be prejudicial in light of the fact that his failure to make an effort to clear his name—from the time of the crime (August 2010) until appointment of counsel—is admissible under traditional rules of evidence allowing impeachment with silence under circumstances where one naturally would assert a fact.  (*Fletcher*, *supra*, 455 U.S. at p. 606 [71 L.Ed.2d at pp. 493-494].)

In light of this forfeiture, it is sufficient for us to observe that defendant's analogy fails.  The violation of due process in *Doyle* is premised on the fundamental unfairness of *the state* promising that a suspect can invoke the privilege against self-incrimination without penalty, and then breaching that promise through using silence to impeach a defendant at trial.  (*People v. Hughes* (2002) 27 Cal.4th 287, 332.)  That defense counsel,

7

as a matter of *strategy*, wishes to keep a client muzzled about alleged exculpatory evidence until trial does not pose a similar unfairness on a fundamental level.[6] Defendant also attempts to rely on the *Doyle* rationale that the irresolvable *ambiguity* of silence after being advised of the right to remain silent without penalty drains that silence of any rational probative value. (*Doyle*, *supra*, 426 U.S. at p. 617 & fn. 8 [49 L.Ed.2d at p. 97 & fn. 8]; *People v. Hunt* (2011) 196 Cal.App.4th 811, 817 [noting that due process is violated where evidence is admitted that does not give rise to any rational probative value].) However, subsequent holdings have referred to this observation as being mere "added weight" to the core holding premised on fundamental unfairness. (*Wainwright v. Greenfield* (1986) 474 U.S. 284, 294 [88 L.Ed.2d 623, 632]; see *South Dakota v. Neville* (1983) 459 U.S. 553, 564-565 [74 L.Ed.2d 748, 759-760].) We therefore reject the claim.

## II.  Instructions on Lesser Offenses Were Not Warranted

Regarding the conviction for shooting at an occupied vehicle, defendant argues the trial court erred in failing to instruct sua sponte on the lesser offenses of firing a gun with gross negligence or assault with a gun, because it is possible the jury could have found on the evidence that defendant's cousin fired the initial shots directly at T.W. and defendant only fired the subsequent shots while the friend was trying to drive her car away from defendant's car (as defense counsel urged the jury to find).

A court is obligated to instruct on lesser offenses only where there is substantial evidence that a defendant is guilty only of the lesser offense but not the greater, i.e., where reasonable persons could conclude that the facts establish only the lesser offense.

---

[6] *People v. Eshelman* (1990) 225 Cal.App.3d 1513, 1520, involving a defendant *who had received advisements* and then refused to talk to a private party on advice of counsel is not apposite, nor does it provide any persuasive explanation why the advice of counsel to remain silent should be a factor playing any role in determining whether a defendant's silence with a private party *after advisements* comes within the protections of *Doyle*.

8

(*People v. Wyatt* (2012) 55 Cal.4th 694, 704.) Speculation is insufficient to establish substantial evidence. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174; *People v. Herrera* (2006) 136 Cal.App.4th 1191, 1205 [inference cannot flow from nonexistence of a fact, must be affirmative evidence].)

As the People correctly assert, the record lacks any substantial evidence that there was any victim *other than* the occupants of the friend's car, and therefore substantial evidence does not support an instruction on assault with a gun. Defendant does not have any cogent response to this argument other than to assert the People did not cite any authority for this proposition. No authority is required other than the element of assault with a gun and the evidence at trial. We therefore reject this contention.

As for firing a gun with gross negligence, assuming that a jury reasonably could reject the testimony of T.W. and the sisters' mother that *only* the driver of the other car was pointing a gun at them before the shots were fired, there is otherwise an absence of any substantial evidence that defendant fired *any* shots. Defendant testified that *only* his cousin shot at the victims and fired other shots as defendant drove away, and his own gun remained under the driver's seat the entire time. Neither the occupants of the friend's car nor anyone else identified any other person affirmatively as firing any of the shots after the initial series aimed at T.W. It therefore is utter speculation (except by way of inference from the testimony that defendant in fact fired the initial round of shots) that *defendant* fired the subsequent shots; disbelieving defendant's testimony does not entitle a trier of fact to infer the opposite of the testimony. (*People v. Drolet* (1973) 30 Cal.App.3d 207, 217; *People v. Samarjian* (1966) 240 Cal.App.2d 13, 18.) Defendant again does not have any cogent response to this evidentiary lacuna. We accordingly reject this contention as well.

9

### III. The Trial Court Properly Responded to the Jury's Question

A little more than an hour after retiring to deliberate, the jury requested to have a readback of the testimony of the sister and her mother, which the jury then heard on the following morning. About an hour after the completion of the readback, the jury sent the following question to the trial court: "We would like to know whether the fact that no one actually saw the gun go off is enough reasonable doubt." Pursuant to the stipulation of the parties (which allowed for a response in writing without reconvening after notice to counsel and the opportunity for input), the trial court proposed the following reply, which the clerk sent to counsel by e-mail: "That is a question for you to decide, not the court. Please refer to the definition of reasonable doubt . . . ." Defense counsel asked that the court also refer the jury to the provided instruction on the use of circumstantial evidence to prove intent or mental state, in particular the requirement that the jury must be convinced beyond a reasonable doubt about any underlying facts before it can rely on circumstantial evidence to establish a fact necessary to a conviction. The court declined the request and delivered its response to the jury in the form it had originally proposed. The jury returned its verdicts about a half-hour later.

In an argument headed, "The Trial Court Failed *to Adequately Answer* the Jury's Question During Deliberations About the Fact No Witness Actually Observed the Firing of the Gun" (italics added), defendant asserts two arguments. The first is the express subject of the heading: Because the jury's inquiry implicated the use of circumstantial evidence, the trial court erred in simply referring the jury to the general concept of reasonable doubt. The second is the claim that the court erred in failing to instruct sua sponte with the general pattern instruction on the use of circumstantial evidence, because the jury would not otherwise understand that the principles in the mental state instruction—in particular, that equivocal circumstantial evidence must be interpreted in a defendant's favor—applied to *any* circumstantial proof of an essential fact (a point

10

*People v. Rogers* (2006) 39 Cal.4th 826, 885 (*Rogers*) makes, which defendant does not cite).

To address defendant's first argument, while section 1138 imposes a duty on a trial court to respond to jury inquiries, where the instructions are otherwise complete the court has discretion to fashion a response to jury questions about applying them to the evidence; however, even if the court abuses its discretion, a defendant must demonstrate prejudice. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) A deviation from the pattern instructions is "risky" (*ibid.*), especially where an inquiry indicates the jury is focusing on a particular issue; at that point, the court must avoid giving an appearance of advocacy. (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1331.)

In jurisdictions other than California, the instruction on the general concept of reasonable doubt is sufficient guidance for the jury in applying it to the specific context of circumstantial evidence. (*Holland v. United States* (1954) 348 U.S. 121, 139-140 [99 L.Ed. 150, 166] ["better rule" is that instructing circumstantial evidence must point unequivocally to guilt "is confusing and incorrect" where jury adequately instructed on standards for reasonable doubt]; *Rogers*, *supra*, 39 Cal.4th at p. 886; see *People v. Magana* (1990) 218 Cal.App.3d 951, 955, fn. 2 ["large number of jurisdictions" do not require special instruction on circumstantial evidence where proper instructions on reasonable doubt included].) The trial court can hardly be considered to have abused its discretion where it fashioned a response that would have the approval of the high court or a substantial number of other jurisdictions; where the inquiry was in effect asking for a quantitative measure of reasonable doubt, the trial court needed to tread carefully. Nor, for that matter, has defendant articulated prejudice. The *only* circumstantial evidence at issue established that *only* defendant was seen with a gun pointed at the victim and the car. (Defendant's testimony is *direct* evidence to the contrary and thus not part of the calculus.) The inference he actually fired the shot is thus the only rational one that a reasonable juror

11

could draw from *this* evidence. It is as if defendant were seen leaning over a roof with a potted plant, and a victim was found directly afterward on the sidewalk below with a shattered skull and the plant next to him. Accordingly, we reject this claim.

Initially, defendant's other claim appeared to be a "lurking" argument (i.e., one that does not have any logical connection with the heading), which would forfeit our duty to give a plenary response to it. (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593, fn. 10; *Smith v. City of Napa* (2004) 120 Cal.App.4th 194, 202.) However, as his reply brief makes clearer, it is a subsidiary argument that the instructions were *not* otherwise complete. While a trial court has a duty to give the general instruction where the prosecution case rests substantially on circumstantial evidence, a court should *not* give the instruction where the circumstantial evidence is *not* equivocal but rather is convincing evidence of a defendant's guilt. (*People v. Heishman* (1988) 45 Cal.3d 147, 167; cf. *People v. Honig* (1996) 48 Cal.App.4th 289, 341[same principle applied to mental state circumstantial evidence instruction].) The instructions were thus complete and, in any event, the lack of this instruction could not possibly be prejudicial to defendant for the same reasons we have previously stated. We therefore reject this argument as well.

### IV.  The Enhancements Must Be Stricken

The instructions allowed the jury to sustain allegations of alternative gun use enhancements (use, firing, and firing with great bodily injury under § 12022.53, subds. (b), (c) & (d), respectively) as to both the charge of attempted voluntary manslaughter and the charge of firing a gun at an occupied car. However, attempted voluntary manslaughter is not a predicate offense for *any* subdivision of the statute (see *id*., subd. (a)), and firing a gun at an occupied car comes within *only* subdivision (d).

Defense counsel called the error to the trial court's attention in connection with the conviction for attempted voluntary manslaughter. The trial court directed the court clerk

to omit the enhancements as to that count in the abstract of judgment, and to reflect in the minutes that the court was striking the enhancements with a "clarification" that defendant was in fact armed during the commission of the offense.[7]  In connection with defendant's conviction for shooting at an occupied car, the minutes and abstract show the court stayed (under § 654) enhancements pursuant to section 12022.53, subdivisions (b), (c), and "(e)," imposing only the enhancement pursuant to subdivision (d) of the statute.

Defendant maintains that we should "reverse" the invalid section 12022.53 findings for both convictions, initially ignoring the fact that the trial court already struck three of them (and then unaccountably asserting in his reply brief that we should ignore the sentencing proceedings).  The People properly concede the invalidity of these findings, pointing out that further ameliorative action is unnecessary with respect to the conviction for attempted voluntary manslaughter.  Neither party discusses the error in the minutes and abstract of judgment that identifies a stayed enhancement of count two pursuant to section "12022.53(e)" rather than the *actual* finding pursuant to section *12022.7*, subdivision (e).

We therefore will modify the judgment to *strike* the two stayed findings under section 12022.53 on count two.  We will direct the trial court to amend its minutes and the abstract accordingly, and also to amend them to reflect a stayed enhancement in count two pursuant to the correct statute, section 12022.7, subdivision (e).

## V.  The Restitution and Parole Revocation Fines Must Be Reduced

Defendant maintains that we must reduce the restitution and parole revocation fines to $200.  The People contend this issue is forfeited on appeal because defendant did

---

[7] Defendant does not raise any argument regarding the inclusion of this "clarification" in the minutes (to which defense counsel objected), and therefore forfeits any claim of error.

13

not object at sentencing.  We disagree that the issue is forfeited and agree that we must modify the judgment to reduce the fines.

At the time of defendant's offenses in August 2010, the minimum restitution fine a trial court could impose pursuant to section 1202.4 was $200.  (Former § 1202.4, subd. (b) [as amended by Stats. 2009, ch. 454, § 1].)  Effective 2012, the minimum was $240.  (See § 1202.4, subd. (b)(1) [also scheduling increases to $280 in 2013 and to $300 for 2014].)

The probation report recommended that defendant pay a $10,000 restitution fine (and parallel parole revocation fine).  However, at sentencing, the trial court stated, "I'm going to order that [defendant] pay a restitution fine under [section] 1202.4 in the amount of $240.  *I'm going to give him the minimum*.  He's getting a life sentence and I don't know when he'll be released, if at all.  The chances of paying this back are rather remote, and I think that's one thing I can do and I'm willing to exercise my discretion in that regard.  [¶]  I'm going to impose the same amount under [section] 1202.45 . . . ."  (Italics added.)  The probation report reflects a handwritten strikeout of the recommended $10,000 figure, and contains handwritten figures in the margin of "~~200~~" and "240."  We thus find that the trial court intended to impose the minimum possible restitution fine as an act of leniency.

Because this statute is considered punishment for purposes of ex post facto analysis (*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248 (*Valenzuela*)), the minimum fine in effect at the time of defendant's offenses was controlling (see *John L. v. Superior Court* (2004) 33 Cal.4th 158, 182, citing *Lindsey v. Washington* (1937) 301 U.S. 397, 400 [81 L.Ed. 1182, 1185] (*Lindsey*) [cannot increase minimum punishment after commission of offense]).

Defense counsel failed to raise this issue at the time of sentencing.  However, this was an unauthorized sentence, i.e., one that "could not lawfully be imposed under any

14

circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.)  While the $240 restitution fine *is* within the lawful discretionary *statutory* range of the present statute, the trial court announced an intention to impose the *minimum* fine, and the only lawful minimum fine that could be imposed *constitutionally* under any circumstance was the $200 amount in effect at the time of defendant's offenses.  (*Lindsey*, *supra*, 301 U.S. at pp. 400-401 [81 L.Ed. at pp. 1185-1186] [cannot impose new minimum of 15 years under statute as amended after commission of offense, even if sentence was within range authorized under former statute]; cf. *Valenzuela*, *supra*, 172 Cal.App.4th at p. 1248 [even though sex offender fine was amount presently authorized under statute, it was in excess of amount in effect at time of offense and thus constitutionally unauthorized for purposes of ex post facto principles; issue thus could be raised initially on appeal].)  As a result, the $240 fine was a *constitutionally* unauthorized minimum fine under any circumstances and defendant did not forfeit the issue.  We will modify the judgment to reduce the two fines to $200.

## DISPOSITION

The appeal in case No. 08F08496 is dismissed.  The judgment in case No. 10F06388 is modified to strike the stayed enhancements (§ 12022.53, subds. (b) & (c)) on count two, and to reduce the restitution and parole revocation fines to $200.  As thus modified, the judgment is affirmed.  The trial court shall prepare an amended minute order and abstract of judgment both reflecting these changes in the judgment and also specifying that the other stayed enhancement on count two (§ 12022.53, subd. "(e)") is in fact pursuant to section 12202.7, subdivision (e).  The trial court shall forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


                                                    BUTZ          , J.


15

**Robie, J. and Mauro, J., concurring:**


We concur with parts I through IV of the majority opinion. Regarding part V, we concur in the result, but we disagree with certain portions of the analysis.

We disagree with the statement in part V that imposition of the $240 restitution fine and the $240 parole revocation fine constituted an unauthorized sentence. The $240 amount was within the lawful statutory discretionary range at the time of defendant's offenses. (Former Pen. Code, § 1202.4, subd. (b) [as amended by Stats. 2009, ch. 454, § 1].) Therefore, it would not be accurate to say that the $240 fines " 'could not lawfully be imposed under any circumstance in the . . . case.' " (*People v. Smith* (2001) 24 Cal.4th 849, 852 [defining " ' "unauthorized sentences" ' "].)

Because the sentence was not unauthorized, and because defendant did not object to the amount of the restitution fine and parole revocation fine in the trial court, his challenge to the amount of those fines is forfeited. (*People v. Smith, supra*, 24 Cal.4th at p. 852 [claims raised for the first time on appeal regarding the trial court's failure to properly make discretionary sentencing choices are not subject to review].) Nonetheless, "[a]n appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party." (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) Whether or not it should reach the question is entrusted to its discretion. (*Ibid*.) On this record we conclude that, in the interests of justice and judicial economy, it is appropriate for us to exercise our discretion to address his challenge to the amount of the fines notwithstanding defendant's forfeiture.

As the majority opinion explains, although defendant did not assert ineffective assistance of counsel in this appeal, the record establishes that the trial court clearly intended to impose the minimum fine, and was simply mistaken regarding the applicable minimum. It is likely the trial court would have imposed the correct minimum if it had been so informed, and there was no justifiable reason for defendant's trial counsel not to

1

inform the trial court of the correct minimum amount.  We agree that the restitution fine and parole revocation fine should be modified from $240 to $200.


We concur:


          ROBIE          , Acting P. J.


          MAURO          , J.